for the appellant is Karen Weiberg. Is that pronounced correctly, sir? Yes, that's right. And for the appellate, Kathleen Shepherd. Mr. Weiberg, you may proceed, sir. Thank you, Your Honors. May it please the Court. Counsel? Counsel. Your Honors, my intention today is to focus my arguments around Issue 1 in the briefs. As you're aware, we've raised four issues. I do believe that in the course of those arguments, much of what we'll end up discussing will be relevant to all of the issues because they do all largely coalesce along the same factual basis. But I am, of course, ready and willing to address any of the issues as Your Honors might wish. So, Your Honors, in 2005, 17-year-old Danny Kuehner entered a blind, guilty plea to charges of attempt first-degree murder and home invasion, charges which carried a sentencing range of up to 120 years. Now, when Danny entered this plea, he entered it on the advice of his attorney. That attorney was his only source of information regarding the evidence that the state was prepared to present against him. Neither Danny nor any of the members of his family had ever seen any of the actual discovery materials in this case. Therefore, they were entirely reliant upon counsel's representations as to what the evidence against him was. As we have since learned, however, many of those representations turned out to be inaccurate or false. Now, as Your Honors are aware, we've alleged a number of different misstatements that were made both by plea counsel and by the prosecutor with the assistance and, in one case, the stipulation of plea counsel. What I would like to do, however, is to start out by hopefully focusing the discussion a little bit by talking about what's significant about these various misstatements and why they are important to the ultimate question of whether Danny would have pled guilty absent those misstatements and whether it would have been reasonable for him to go to trial absent those misstatements. So what we have here really fall in two different categories. We have statements regarding the injuries that were done to the victim in this case, Mrs. Geldrich. And then we have statements regarding that exaggerate to various degrees the apparent culpability that Danny himself would have had for those injuries. Now, as far as misstatements regarding the injuries are concerned, this is very significant when we're considering the question of whether or not Danny would have pled guilty. And it's significant for a couple of reasons. First, the most serious charge that Danny faced here was the attempt to first-degree murder charge. That charge was not only the most significant, it currently makes up 17 and a half years of the 35-year sentence he is serving. Attempt to first-degree murder is, of course, a specific intent crime. Now, Danny, however, was being charged here under theory of accountability. He himself was not present at the time that co-defendant Bruce Lloyd did injury to this person. He was outside. He was actually over at Chris Howell's house. But, so... Who was the second person inside? It's a fellow named Bruce. There was no second person inside. So the victim was mistaken? The victim did not state that there was a second person inside. We have the transcripts of her interview with the police. And she repeatedly referred to a single person. She said, he did this, he did that, he did this. And she mentioned at some point that she thought there were two people inside? No, Your Honor. What she actually said was, she said, I only saw one person. I don't see very well, so there could have been two. But she explicitly stated she only saw one person. She was only aware of one person being in the house. And that is consistent with what Chris Howell has said. That is consistent with what Danny Keener testified to on the state's behalf at Chris Howell's trial. So, Your Honors, in trying to determine whether or not he's going to be found guilty of attempt first degree murder, Danny Keener has to determine, did Bruce Lloyd try to kill this person? Now, when you are being told that this person was beaten into a coma that lasted nine to ten days, they had substantial bleeding from their head to face, fractures on both sides of their face, a broken arm, all of these injuries, this sounds like an extremely severe attack. This sounds, quite frankly, like an attempt to kill someone, particularly inflicted upon a 98-year-old woman. Faced with that evidence, Danny would have little reason to question that Bruce Lloyd actually did try to kill this person. However, that is not the evidence. Didn't the victim report that the beating stopped when she played dead? The victim did report that she, yes, I believe she said she played dead, she stopped moving, and that was what put a stop to the attack on her. And she suffered broken bones? No, Your Honor, she did not suffer broken bones. She suffered two fractures. There was a less than one centimeter fracture to, I believe it was the left maxillary. So a fracture isn't a broken bone? Your Honor, I would say, at least under my, based on my understanding, and I think common lay understanding, there would be a significant difference between a less than one centimeter fracture and a broken bone, particularly in terms of when we're trying to assess the severity and the violence of the attack. An attack that literally breaks a bone into two pieces is likely to be a much more forceful, much more dangerous attack than one that creates a slight fracture. So they beat this 98-year-old blind and deaf woman, left her in a pool of blood? Well, Your Honor, actually, again, we don't have much testimony on that. What we know is, first of all, according to the testimony that Danny gave at Chris Hull's trial at the State's behest, Bruce Lloyd told him repeatedly all he did was push the woman and she fell down. We also have her actual injuries, which are, quite frankly, at least I would say from a common sense perspective, not consistent with what one would expect if an 18-year-old husky young man tried to severely batter a 98-year-old woman and attempted to beat her to death. We know she was not in any danger of actually dying at any time. We know that she only suffered these two very small fractures. The only bleeding that she suffered was from a bloody nose. Now, Your Honors, no one is suggesting, and I do want to stress this, no one is suggesting or would suggest that any kind of injury to a 98-year-old woman is anything other than serious. But there is a difference between... You just did suggest it. Yeah, I mean... You just suggested it, and then you said, now, no one's suggesting. It's exactly what you just said. Well, no, Your Honor. What I'm suggesting is that it is not indicative of an intent to kill. Now, whether or not it is a serious matter that someone harmed a 98-year-old woman, it absolutely is and always would be. And notably, even if Danny were to end up being acquitted of attempt first-degree murder, there are still aggravated battery and home invasion charges up there. This is a serious offense, no matter how we look at it. But where the question is, would a 17-year-old boy who is trying to determine whether or not to plead guilty, would it make a difference to that decision if he thinks that the victim was battered into a coma and suffered all of these extremely serious injuries, where in point of fact what the medical evidence shows is one small fracture to the sinus cavity or the sinus wall. And I believe they refer to it as a Hill-Sacks fracture, my understanding from the... This is an unusual case because we have a claim of ineffective assistance to counsel, and the counsel was allegedly ineffective, actually testified. Yes, he did, Your Honor, at the motion to withdraw plea. And he testified as following. Did you say the fast-draw case against this defendant was a very strong answer? I wouldn't say it was very strong. I would say it was overwhelming. So your argument is essentially that's an unreasonable assessment by defense counsel considering ineffective assistance? Well, Your Honor, first of all, yes, I think that is an unreasonable assessment of the evidence. But secondly, and more importantly, the ineffective assistance here is not in the legal advice itself. It is in the misrepresentation to the defendant of what the evidence was, which not only impacts the defendant's ability to make some kind of a predictive judgment about what his opportunities are at trial, what he should do. It shifts his belief in what sentencing is going to look like. It robs him of the ability to himself make any intelligent decisions about his case because he is acting on incorrect information, information that is exaggerated and that does not represent the actual evidence against him. And in the absence of having... So this lawyer believed the evidence of his guilt was overwhelming about this 98-year-old blind and deaf woman who was beaten to this extent, suffers a fracture and says the beating stopped only because I played dead. Because the precise extent of that beating was either miscommunicated or misunderstood by your client, but for that he wouldn't have pled guilty? Well, first of all, Your Honor, I would like to offer a point of clarification there. When we talk about misunderstood, the statements that we have in the record and that at this point we have to take as true because we are at the second stage, we're not talking about a misunderstanding here. We're talking about statements 9 to 10 days in a coma. She wasn't even in the hospital for 9 to 10 days. Well, she went to rehabilitation after getting out of the hospital, right? She did, Your Honor. She didn't go home. No, but the reasons for that noted in the medical records are actually not due to her injuries. It's noted that she was not receiving adequate care at home, and that is why she was discharged to a rehabilitation facility. Didn't Coonrod testify that her shoulder was dislocated and she had fractures in her arm? Who? Coonrod. Ms. Coonrod testified much later at the sentencing hearing that, yes, she had fractures in her arm, which, again, we're not contesting. She did have a single heel sac fracture at the joint where the arm was dislocated. Yes. So you're saying that the real burning issues to this 17-year-old kid were the specific facts of the beating of the 98-year-old lady. It wasn't the possibility he's looking at 12 to 120 and his lawyer's saying, I'm going to work and see if we can get you down to maybe 12 to 20. So out of those two things, you're saying, oh, no, it was the specifics of the facts is what made this kid make his decisions. It had nothing to do with the fact that he's looking at 12 to 120. No, Your Honor. Actually, I think it had a great deal to do with the fact that he was looking at a 12 to 120. And when he's trying to determine whether he's going to see 12 to 120, first of all, I would note this was a blind plea. He was facing 12 to 120 after the guilty plea. He did not get any sentencing benefit from this. Second, I would point out that when he's trying to think about, am I going to do 12 to 120, the question of whether this person was beaten into a coma, that's going to make a difference in what you think your sentencing calculations are going to look like. The question of whether you think your co-defendant is going to get up there and testify that he watched you go into that house right before this attack occurred, even though you know you didn't do that, that's going to make a big difference in how culpable you think you're going to be seen and how large a sentence you think you're going to see. The question of whether the victim herself declared that there were two people in the house, which again indicates or is certainly going to be argued to indicate that you were present and were in some way a part of this attack on this person, is going to make a substantial difference in what you think that sentencing exposure looks like, particularly when you add in claims that there was blood found on your shirt that was going to match the victim that would somehow again seem to imply that you were present and a part of whatever Bruce Floyd did to this person. All of those things make a huge difference in what you think your sentencing range is and what you think is to your benefit. And in particular... Okay, so let me ask you this. Assuming that you're correct about the representations that were made, the misstatements that were made, if it is determined that it was appropriate to find that the defendant who was accused of actually beating the victim, if that was done with the intent to kill, where does that leave your client? Well, Your Honor, there's two responses to that. And the first one is, if it were ultimately determined, but I would note, if it were determined in Danny's case, not based on what happened in Bruce Floyd's case, because that is obviously not applicable here. If it were determined in Danny's case that Bruce Floyd committed attempt first degree murder, then yes, it would appear that Danny would then be found guilty of attempt first degree murder. Now... Irrespective of the misrepresentations, right? Well... I mean, it really wouldn't matter on an accountability theory. Respectfully, Your Honor, I think the question here is whether or not he would have pled guilty, not whether he would have ultimately won. Right, but what I'm saying is, it's not as if we're looking at a situation where he's accused of committing, you know, the beating. So on an accountability theory, when you're looking at whether or not you're going to be held accountable for someone else's actions, if it's determined that that person did act with the intent to kill, that seems to really diminish the importance of these facts. Actually, Your Honor, I think that actually points to the importance of these facts, because the decision that Danny is making, the question we're talking about now, is not ultimately would Danny win in a trial. At this point, the most he has to show is that he would have a plausible defense, that it would be reasonable for him to go forward and go to trial. And we know to that extent, there are cases from both the Illinois Supreme Court and the United States Supreme Court that talk about the fact that a lot of that also has to do with considering the benefit that you've got. Even an incredibly small chance at improving your circumstances at trial, it might very well be rational to go forward and go to trial if your plea offer was 18 years and your max is 20. Now, Danny didn't get any sentencing concessions. He's facing the 120 either way. So if he thinks he has any chance of possibly beating the attempt for first-degree murder, of possibly getting a finding that there was not great bodily harm or severe bodily injury, both of which are extremely important factors in this case, because that is what makes these sentences consecutive, and it's what makes them served at 85%. He's serving 35 years right now. If he doesn't even get the 85% finding, he's already, I don't know, I guess at this point he would be about two years away from being home. The difference this makes in your sentencing exposure is huge, and all of those things relate to these statements and these claims about severe injuries to Mrs. Geldrich that did not take place. And that makes it impossible for him to adequately assess his case and to make a determination about whether he should or should not plead guilty and what he thinks his sentencing exposure is. If Bruce Lloyd committed attempt first-degree murder, then it appears Danny is accountable for that. But in order for Danny to determine whether or not he should go to trial and challenge that, he has to have some idea what actually happened to Mrs. Geldrich. And what he's been told is simply not the truth. What happened with Bruce Lloyd? Bruce Lloyd ultimately pled guilty, although he denied ever having an intent to kill. What did he plead guilty to? Attempt first-degree murder and home invasion. What sentence did he get? He received 50 years. Didn't he tell the police that your client beat the woman? He did, Your Honor. And had this not been a guilty plea in this case, could Lloyd have been flipped to testify against your client? I suppose that could have happened. Now, according to the statements the prosecutor made both in Lloyd's proceedings and in Danny's, the prosecutor's belief was that Lloyd was the principal attacker in this case, and so I would be surprised if they would choose to offer Lloyd a reduced sentence to go after Danny. If they did, it is always possible that Bruce Lloyd could get up on the stand and testify to that. That's what he told the police before there were any plea negotiations. Isn't that true? Well, yes, he did. So there would be some basis if he were then to testify against your client that this wasn't a jailhouse conversion. If he were to try to bring out the fact that, hey, he's just saying this for himself, he'd bring out that before there was any plea agreement, he told the same thing to the police that Danny Keener was the beater. Well, Your Honor, to that extent... Isn't that something which trial counsel could consider in advising his client to plead guilty? Certainly. That is one thing that trial counsel could consider, and that is one thing... Is it more than 50 years that Lloyd got as opposed to the 35 that your client got? Yes, that is one thing that counsel could consider, and it's one thing that Danny could consider if Danny actually had the relevant information about his case to be able to consider anything. Did he know that Lloyd figured him as the beater? Presumably, yes. Go ahead. So ultimately the question here is, was this a knowing and voluntary plea? It was not. You cannot enter a knowing and voluntary plea when you do not even know, in fact, you are operating under an active misapprehension of what the evidence is. In fact, there's extensive case law talking about misapprehension of fact as being a basis for withdrawing a guilty plea. In this case, Danny could have considered the fact that Lloyd could testify against him. He also could have considered what Chris Howell actually told police. He could have considered what the other evidence actually is, which as the sentencing judge in this case found, there was no competent evidence to suggest that Danny ever went inside that house other than after the fact. However, in order for him to consider those things and make a knowing and voluntary decision whether or not to plead guilty, he has to have some idea of what the real facts in the case are. And in this case, he simply did not because what he was told was simply wrong. And we have the evidence in the record that shows that it was wrong. As your honors are aware, we have requested two forms of relief in the alternative in this case. We have argued in the first place that we believe that because many of the misstatements at issue here are stipulated to on the record, and the evidence regarding those misstatements showing that they are misstatements is present in the record, we believe that there is not a need for further fact-finding in order to determine that Danny was in fact denied the effective assistance of counsel and that therefore the appropriate remedy would be to remand this case for an opportunity for him to withdraw his plea. However, we do understand that there are also other allegations that were not fully represented in the stipulation, and insofar as your honors feel that those may be more significant and those do require a credibility finding, we ask in the alternative that this court would go ahead and remand this for a third stage evidentiary hearing where the credibility of all of the various evidence could be put to the test. Okay, thank you, counsel. Your time is up. You have an opportunity to address this again in your vote. Ms. Shepard? Can I please report? Counsel? Counsel? In order to sufficiently allege that plea counsel was ineffective, the petition must make a substantial showing both that plea counsel's performance was objectively unreasonable and that there's a reasonable probability that but for counsel's error, a defendant would not have pleaded guilty and would have insisted on going to trial. That's a different standard that applies under Brown. Speak up a little bit. That is a different standard that applies under Brown and Lee as opposed to what the defendant is arguing. It's based on his claim that counsel's advice had to do with misrepresenting the facts as opposed to misrepresenting or misadvising him and affirmatively misadvising him on the consequences of his plea. So he has to show that he would not have pleaded guilty, would have insisted on going to trial, and in addition to all the evidence that if Lloyd, whoever beat the victim, and whether it was Lloyd or the defendant took a part in that, had specific intents to kill the victim, I would note also that the defendant admitted that he went into the house and checked the victim to see if she was breathing, checked her pulse, and then afterwards neither he nor Lloyd called for help, and Lloyd made statements after the offense as well that he wouldn't have cared. I don't have the exact quote, but basically, I've killed people before I wouldn't care if she was dead. That if the question is whether or not there was specific intent, we've got Lloyd and defendant making statements indicating an intent at least to that they didn't care if she had died, and that supports also along with all the other evidence that there was specific intent to kill. But even if this court were to find that he had a plausible defense to attempted murder, even if, well, that the petition sufficiently alleges that, and also even if it finds that he likely would have been acquitted of that charge, he made no allegation he had a plausible defense to any of the remaining charges, and the record shows there was overwhelming evidence that defendant or Lloyd inflicted severe bodily harm, committed those other offenses. Looking just at his sentencing exposure, even if the defendant had gone to trial, the best he could have hoped for was that he would be acquitted of attempted murder, and he still faced mandatory consecutive sentences for the other, the class X home invasion. What were the other offenses that he faced that were dismissed as part of the plea agreement that he would face if he had gone to trial? What were the other offenses? They were dismissed as part of the plea. What would he have been looking at? The other offenses that were dismissed were residential burglary, robbery of a senior citizen, aggravated battery to a senior citizen, criminal damage to property, and also the attempted armed robbery, in the other case for the attempted armed robbery. And home invasion as well. And home invasion as well, which, as your honors know, it's class X. So these were attempted murder as a class X offense, and home invasion as a class X. You seem to be suggesting to us that in the case going to trial, there's only real defense, I guess. Defense would be lack of specific intent, so maybe commitment on the attempted murder charge. What about the others could have been convicted of had that happened? What are we talking about as far as the class of offense? And were these all required or permitted to be consecutively imposed? And what kind of sentencing range did he then face? He was admonished that the first four charges, the attempted murder, home invasion, residential burglary, and robbery of a senior citizen, all were mandatory consecutive. And whether or not we apply the section of the statute that applies to aggregate sentencing, the limit to aggregate sentencing, the least that he would be exposed to would be a 90-year sentence. And so what's his best bet for going to trial? Would he have insisted on going to trial just looking at the sentencing exposure and say, yes, I'd rather, I've got a plausible defense to attempted murder, if this court finds that he does, then what's his best hope? His best hope that he doesn't allege that he has any plausible defense to those other charges. So he would be still subject to a 90-year sentence at least, and that wasn't covered in the record as to what the sentence would be on those other charges. That's my reading of the statute that was in effect in 2005. And he would have given up the benefits of his plea. Because he pleaded guilty, his sentencing hearing was postponed for nearly two and a half years to allow him to give testimony and help in the prosecution of his co-defendants. And as Your Honor pointed out, if he hadn't done that, they would have testified at his trial and said some bad things against him. The trial court specifically considered his cooperation in those cases as a mitigating factor in sentencing him. It also said he would have considered his guilty plea as mitigation if the defendant hadn't gotten up in elocution and said he didn't accept responsibility. The state at sentencing presented only limited evidence of the aggravating circumstances of the offenses, and those were many. And had he gone to trial, all of that evidence would have been presented in much greater detail and volume. Mr. Weinberg seems to suggest that because there was no specific agreement as to years, he got no benefit from pleading guilty. What about that? The question is whether or not – well, we look at these other benefits. There are a few more, but including that, of course, he got dismissal of the charge in the related case for the attempted armed robbery of the cab driver, which counsel's advice that that was mandatory and consecutive would seem to be correct because of the severe bodily injury inflicted in this case. So he gained those other benefits. And so how does that cut? His sentencing exposure was still 90 years. The standard is whether or not he would have insisted on going to trial and that he probably – yes, if he would have insisted on going to trial. And whether or not a decision to go to trial would be rational or whether he would have had access to the discovery, which of course he has no right to, that's something that applies only when the counsel's erroneous, alleged erroneous advice goes to the consequences of the plea. And we don't have that here. So it's an interesting case for many reasons, but one is that the defendant alleges, not that the statements he challenges are merely misleading, but that they're false. And in determining the sufficiency of this petition, second stage, of course all well-pleaded facts not positively rebutted by the trial record are to be taken as true. And because his allegations are that the statements are false and because of the nature of a guilty plea, the truth or the falsity of the statements he challenges must be judged according to what the entire record shows. And that the record does not show what evidence the prosecutor was relying on when he stated the state's evidence would show the victim was unconscious when found, could not have been relying on Sims' interview with Lynn a year later when stating the state's evidence would show her face was stomped. It doesn't make those statements false, but merely reflects the nature of a guilty plea, which does not require that the record show the evidence on which it is based. So the defendant has a heavy burden to make a substantial showing that the statements aren't false, and the materials on which he relies show at most that there may be evidence which conflicts with those statements, not that they are false. They do not make a substantial showing that the state did not have evidence, as counsel stipulated it did, which would show what was stated. And also, as to the medical records, there are only 11 pages out of the hundreds of pages of the medical records that were provided in discovery. And it's interesting to hear opposing counsel describe what they in fact show.  would not themselves be admissible under the business records exception in the defendant's criminal trial. At trial, the doctors and others who authored those records would have testified about the victim's injuries. So to look at these few pages of the victim's medical records from the first two days of her treatment, and as Your Honor pointed out, she was in the hospital for four days, but then she was in the nursing home for another 14 days. I would dispute, at least say that I certainly don't recall that the medical records that were attached to the petition would establish that she was only staying there kind of for her leisure because she couldn't go home because no one was there to take care of her. So the record clearly positively rebuts the petition's claim that the defendant was prejudiced. You don't have to go into the objectively unreasonable question. And I would note, too, the reason that I focused on the factual basis in my brief was because the petition, in talking about what counsel told the defendant and what he did before the plea, the petition basically gave a narrative of what counsel supposedly did. And nowhere in that narrative did the petition say, identify what the misstatements were. It was in talking about the plea, or the factual basis of the plea, that the petition said, well, these were misstatements. And also the alleged misstatement as to the sentence exposure for the attempted armed robbery charge. That was stated. So unless this Court has any further questions, we would simply ask you to... I see none. Thank you, counsel. Mr. Weiberg, any rebuttals, sir? Yes, Your Honor. Thank you. Okay. Just to address a few things that counsel raised. First of all, are the statements false? Yes. We have a medical record, a CT scan of Mrs. Gelbrich's face. Did she have fractures on both sides of her face? No. That CT scan finds one less than a centimeter fracture and explicitly finds no other facial fracture. We have the discharge summary, which describes the entire course of her treatment and makes no mention of her being comatose for nine to ten days. We have the ambulance reports, which state that she was conscious when she was found. We have the doctor's reports, which state that she was not only conscious, but combative during her examination. Are these statements false? Yes. And the evidence proves that they are. I would like to address the State's claim that the State, one of the benefits that Danny got out of all of this was the limited evidence and aggravation that was presented at Danny's sentencing hearing. As already detailed, much of the evidence and aggravation that was presented at Danny's sentencing hearing was false. It was these exact same claims. That factual basis that plea counsel stipulated to was a part of the record and was taken explicitly into consideration by Judge Kelly when he sentenced Danny in this case. Would Danny have been better off if the actual evidence had been presented as it would have at a trial? Absolutely. Less evidence that less severe injuries were done can only be good. So I'm a trial judge and I hear about this beating this woman suffered and I'm going to think, oh, just one fracture to her nose instead of two? Well, then it's not a serious matter. Is that the argument? Your Honor, I don't think there's any question that it's a serious matter, but the question is how serious. So my assessment of how serious the dislocated shoulder, the fractured arm, the fracture in her face, that's going to be, I'm going to view that as significantly less serious because what? Because the victim was not, in fact, in a coma for an extended period of time? So the victim, the argument was the victim was in a coma, but she really wasn't. She was left for dead when they found her and she was responsive. So therefore what? As a sentencing judge, this is going to seriously affect my assessment of how awful this crime was? Yes, Your Honor. I would imagine the difference between a 98-year-old woman who may have been pushed down and may have dislocated her shoulder, that is serious. That is not as serious as beating a 98-year-old woman into a 10-day coma. Who may have been pushed down? Is there some dispute about that, too? Oh, Your Honor, there's not significant evidence as to exactly what happened. That was Bruce Lloyd's claim was that he pushed her down. Ms. Galbraith reported being struck with an object. She stopped when she had the wherewithal to pretend as if she were dead. How would the sentencing judge view that evidence? I would imagine they would find that highly disturbing. Go ahead. With regard to the various calculations and theorizings about the sentencing range that Danny faced, the minimum he faced was not 90 years. The minimum he faces if he goes to trial, at least in theory, is zero. Assuming that he is found guilty, he could still avoid findings of severe bodily injury or great bodily harm. Is there any possibility that he would have been found not guilty of any of these crimes other than attempted murder? No, it seems most likely that he would have been found guilty of at least aggravated battery and home invasion. What about all the others he was charged with? The others don't actually increase the sentencing exposure, Your Honor, because this all occurred as part of a single course of conduct, and therefore by statute he can only be sentenced to the maximum sentence for the two most serious offenses. And the two most serious offenses in this case, well, they were attempted first degree murder and home invasion. What about the attempted armed robbery of the cab driver that was dismissed as part of the plea? I believe an attempted armed robbery of a cab driver, assuming that that were actually to go to trial and could be proven, the attempted armed robbery of a cab driver would have added, I think, maybe five years to a sentencing range up to 120. How did Lloyd wind up with 50? Presumably because he's the person who actually struck that woman, and presumably because he's the person who actually injured her. And also it bears note that, as counsel noted below, some of this misleading, inaccurate evidence was presented as part of Lloyd's hearings as well. As far as why he received 50, I would assume it's because he is the principal and because he actually committed these acts. I would also note, Your Honors, that as far as sentencing here, Danny came up with 35 years. According to the Illinois Supreme Court, the maximum that a 17-year-old non-homicide offender can receive is 40. So that is a lifetime. Thank you, counsel. We'll take this matter under advisement. Thank you.